IN THE SUPREME COURT OF TEXAS






IN THE SUPREME COURT OF TEXAS
 
════════════
No. 04-0575
════════════
 
Columbia Medical Center of Las 
Colinas, Inc. d/b/a Las Colinas Medical Center, Petitioner,
 
v.
 
Athena Hogue, Individually 
and as Executrix of the Estate of Robert Hogue, Jr., Deceased, Christopher 
Hogue, and Robert Hogue, III, Respondents
 
════════════════════════════════════════════════════
On Petition for Review from the
Court of Appeals for the Fifth District of 
Texas
════════════════════════════════════════════════════
 
 
Argued April 12, 
2005
 
            
Justice Wainwright 
delivered the opinion of the Court, in which Chief Justice Jefferson, Justice O’Neill, 
Justice Brister, Justice Medina, Justice Johnson, and Justice Willett joined, and in Parts 
II-A, II-C, and II-D of which Justice 
Hecht and Justice Green joined. 
            

            
Justice Brister filed a 
concurring opinion, in which Justice 
Medina joined.
 
            
Justice Green filed an opinion concurring in part 
and dissenting in part, in which 
Justice Hecht joined.
 
            
This is a medical malpractice case. In this appeal, it is undisputed that the 
hospital caused Bob Hogue’s death. The jury made that finding at trial, the 
hospital does not challenge it in this Court, and the dissenting justices 
acknowledge that the evidence supports that finding. The primary issue presented 
to this Court is whether sufficient evidence was admitted at trial to support 
the jury’s finding that the hospital was also grossly negligent in causing 
Hogue’s death.
            
On Monday, March 2, 1998, a seemingly healthy Bob Hogue had dinner with his 
college-aged sons in Texas before traveling to Albuquerque, New Mexico 
for business. One week later, doctors struggled unsuccessfully to save his 
life as his organ systems failed. His widow and sons brought this medical 
malpractice action against the hospital to which Bob Hogue was initially 
admitted. The jury found the hospital negligent and grossly negligent and 
awarded over $30 million in actual and exemplary damages. The trial court 
reduced the exemplary damage award per chapter 41 of the Texas Civil Practice 
and Remedies Code. The court of appeals affirmed the trial court’s judgment on 
exemplary damages but concluded that the Medical Liability and Insurance 
Improvement Act capped actual damages and reduced the total damages award to 
under $5 million. 132 S.W.3d 671.
            
The hospital petitioned this Court for review, challenging (1) the trial court’s 
submission of the patient’s contributory negligence in an unusual third phase of 
the trial separate from the general liability question, (2) the legal 
sufficiency of the evidence of the defendant’s gross negligence, (3) the legal 
sufficiency of the evidence to support loss of inheritance damages, and (4) the 
application of the pre-2003 version of the pre- and postjudgment interest 
statutes to this case. Because the hospital did not present legally sufficient 
evidence of contributory negligence, we do not decide whether the unusual 
submission of the contributory negligence question was error. We hold that the 
Hogues presented clear and convincing evidence on which a jury could reasonably 
conclude that the hospital was grossly negligent. We also hold that there is no 
evidence of loss of inheritance damages, and we conclude that the 2003 
amendments to the Texas Finance Code, concerning interest on judgments, do not 
govern this case. Therefore, we reverse the loss of inheritance damages, and 
affirm the remainder of the judgment.
I. Factual and Procedural Background
            
After dinner with his wife on Thursday, March 5, 1998, Bob Hogue complained that 
he had an upset stomach and felt a little dizzy. The next morning, he felt 
tired. Thinking he might have caught the flu and may not recover in time for 
scheduled business travel on Monday, Hogue’s wife Athena suggested he see a 
doctor. Dr. Jay Story, who had never before examined Hogue, examined him around 
noon that day. Dr. Story diagnosed Hogue with pneumonia and prescribed some 
medicine. Dr. Story also asked Hogue to schedule a follow-up appointment for 
Monday morning before Hogue left town.
            
Hogue took the medication Dr. Story prescribed, but his symptoms continued 
through the weekend. On Sunday evening, Hogue’s wife called Dr. Story’s office, 
concerned because Hogue coughed up pink-tinged phlegm. The on-call doctor 
instructed her to take her husband to the emergency room if his condition 
worsened, but otherwise just to return to Dr. Story’s office in the morning. By 
Monday morning, Hogue’s condition had worsened. The Hogues traveled to Dr. 
Story’s office early and requested to see a doctor immediately. Dr. Story 
x-rayed Hogue’s chest, advised him that his lungs were infiltrated with fluid, 
and dispatched him to Columbia Medical Center of Las Colinas by ambulance. Dr. 
Story then called Columbia Medical and alerted the emergency room (ER) doctor, 
Dr. Gregory Blomquist, that he was sending over a patient he had diagnosed with 
pneumonia. Dr. Story advised Dr. Blomquist that he did not have a medical 
history for the patient. 
            
Shortly after 9:00 a.m., Dr. Blomquist met the Hogues at the emergency entrance. 
Hogue was conscious but was in severe respiratory distress, breathing 
approximately once every second. Dr. Blomquist recognized that Hogue was 
seriously ill. While beginning his physical exam of Hogue, Dr. Blomquist asked 
Hogue basic questions about his symptoms and medical history. Hogue replied in 
the negative to questions about chest pain, family history, and risk factors for 
heart disease, such as smoking, high cholesterol, or high blood pressure. Hogue 
also “denie[d] any symptoms except shortness of breath [for the preceding] three 
days, and a slight cough.” In response to a question about having previously 
experienced similar symptoms, Hogue answered, “I’ve always been healthy.” No one 
told the health care providers that Hogue had been previously diagnosed with a 
heart murmur, even though in September 1996 Hogue reported a history of a heart 
murmur during a routine physical exam. His family doctor, Dr. Richard Honaker, 
had confirmed the existence of a heart murmur and recommended a follow-up with a 
cardiologist, which never occurred.
            
While questioning Hogue, Dr. Blomquist also evaluated his physical condition. 
Hogue was sweating and struggling to breathe. He had a blue tint around his 
mouth, his fingernails, and his other extremities, indicating that Hogue was not 
exchanging oxygen well. Dr. Blomquist’s physical exam revealed a tachycardic 
(fast) heart rate, occasional skipped heartbeats, and an abnormal, extra heart 
sound in each heartbeat, but Dr. Blomquist detected no heart murmur. Dr. 
Blomquist ordered an electrocardiogram (EKG) and blood tests designed to 
identify acute heart injury markers. The results from these tests were 
negative.
            
Within minutes of Hogue’s arrival, Dr. Blomquist called Dr. Timothy Schroeder, a 
critical care pulmonary specialist and director of the intensive care unit (ICU) 
at Columbia Medical. Dr. Schroeder was not at Columbia Medical because he was 
seeing patients at another hospital. During the conversation, Drs. Blomquist and 
Schroeder agreed that Dr. Blomquist would “stabilize [Hogue] and make sure he 
was on a breathing machine, make sure we tried to get his oxygenation up, make 
sure we got labs set up, those types of things.” Dr. Blomquist then intubated 
Hogue and placed him on a ventilator. 
            
By approximately 11:10 a.m., Dr. Blomquist had stabilized Hogue for transfer to 
the ICU and paged Dr. Schroeder to inform him. Within a half hour, Dr. Schroeder 
returned the page and agreed that Hogue would be admitted to the ICU under Dr. 
Schroeder’s care. Around 12:30 p.m., Dr. Blomquist transferred Hogue to the ICU. 

            
Dr. Schroeder arrived in the ICU between 1:10 and 1:30 p.m. and began his 
evaluation and examination of Hogue. Dr. Schroeder conducted a number of tests, 
including one that identified abnormal chest pressures in Hogue’s pulmonary 
arteries. Dr. Schroeder contacted cardiologist Dr. John Lawson for help 
interpreting some of this data. By the end of the telephone conversation, the 
doctors decided that a consult was necessary. Although Dr. Lawson was also not 
on-call at Columbia Medical that day, he agreed to evaluate Hogue after he 
attended to his patients at other hospitals. He did not specify a time. After 
conferring by phone with Dr. Lawson, around 3:35 p.m., Dr. Schroeder ordered an 
echocardiogram (echo) of Hogue’s heart “now,” which he testified is equivalent 
to “stat.” Columbia Medical’s list of medical abbreviations defined “stat” as 
immediately. An echocardiogram, which is a cardiac ultrasound that produces 
images of the heart, is different from an EKG, which graphically records the 
electrical activity of the heart. Cecil 
Essentials of Medicine 47, 55 (Thomas E. Andreoli, M.D. et al. eds., 6th 
ed. 2004).
            
The hospital also played a prominent role in Hogue’s treatment. Although 
Columbia Medical did not have in-house echo services, the hospital had 
contracted for those services from a third-party vendor, but declined to 
exercise an option to guarantee an expedited response time for echocardiographic 
studies. Dr. Schroeder ordered the stat echo at 3:35 p.m., but the radiology 
department did not page the outsourcing echo service until approximately 4:10 
p.m. The echo technician returned the page within twenty minutes and discussed 
the doctor’s order with an ICU nurse. The technician was informed that a stat 
echo had been ordered, but he testified that he was not given the impression 
that Hogue needed urgent attention; rather, the ICU nurse stated that Hogue was 
stabilized on a ventilator and that his condition was not heart-related. The 
technician arrived shortly after 6:00 p.m., set up the echo equipment, and began 
the study. He immediately identified a severe leakage of Hogue’s mitral valve 
and interrupted the study to alert a nurse. He finished the study around 6:30 
p.m., approximately three hours after the stat echo was ordered. The technician 
observed that at least 
 
 
class=Section2> 
one 
leaflet of the mitral valve was almost completely unhinged and what we call 
flailed, meaning that it’s just flopping around in a breeze with nothing to hold 
it in place . . . . And also, the size of some of the chambers on [Hogue’s] 
heart in proportion to his body size suggested to [the tech] that this was an 
acute event and not something that had been around a long time. 
 
 
 
class=Section3> 
Based on the 
technician’s findings, cardiologist Dr. Phillip Hecht, one of Dr. Lawson’s 
partners, was called. Dr. Hecht determined that Hogue required emergency surgery 
to repair his mitral valve and needed to be transferred immediately to Baylor 
Irving Hospital. After Dr. Hecht ordered the transfer at approximately 7:45 
p.m., it took Columbia Medical an additional 20–25 minutes to arrange for the 
ambulance transfer to Baylor Irving. Shortly after arriving at Baylor Irving at 
8:46 p.m., more than two hours after the echo study was completed, Hogue coded, 
and efforts to resuscitate him failed. Dr. Lawson arrived at Columbia Medical 
after Hogue’s transfer to Baylor Irving. 
            
Hogue’s wife and their two sons sued Columbia Medical, asserting survival and 
wrongful-death claims,[1] and the case proceeded to trial in 
three phases. The first phase consisted of approximately two weeks of evidence 
and argument, after which the court charged the jury to decide whether Columbia 
Medical was negligent in Hogue’s treatment, and if so, whether it was grossly 
negligent. The jury returned a finding adverse to Columbia Medical on both 
questions and awarded the Hogues $9,196,155 in actual damages. 
            
During the second phase of trial, the jury assessed punitive damages of 
$21,000,000 against Columbia Medical based on the gross negligence finding in 
the first phase. During the third phase of trial, the jury heard further 
argument but no additional evidence, and the trial court instructed the jury to 
consider whether Hogue contributed to his injury when he did not inform his 
treating physicians that he had been diagnosed with a heart murmur. The jury did 
not find that Hogue was contributorily negligent. The trial judge capped the 
punitive damages pursuant to chapter 41 of the Civil Practice and Remedies Code, 
but did not cap the actual damages pursuant to the Medical Liability and 
Insurance Improvement Act (MLIIA). 
            
Columbia Medical appealed. The court of appeals reversed the trial court on the 
applicability of the MLIIA to actual damages, capped actual damages at 
$1,471,405.20, and affirmed the remainder of the trial court’s judgment, 
including exemplary damages of $3,356,296. 132 S.W.3d 671. Columbia Medical 
petitioned this Court for review.
II. Discussion
            
Columbia Medical asserts that the trial court committed reversible error by 
submitting the contributory negligence question in the third phase of trial 
instead of with the general liability question. We first consider whether 
contributory negligence should have been submitted to the jury. 
A. Contributory Negligence
            
In this case, the jury found Columbia Medical negligent because it failed to 
timely provide necessary services to diagnose Hogue. Columbia Medical asserts 
that Hogue was contributorily negligent for failing to disclose his previous 
heart murmur diagnosis. The Hogues counter that there is no evidence of 
causation or evidence that the hospital would have done anything different if it 
had known of Hogue’s heart murmur. Therefore, they contend that failure to 
submit the contributory negligence question in the first phase of the trial was 
not error. 
            
Admittedly, physicians at Columbia Medical began treating Hogue without the 
benefit of his complete medical history. The record indicates that Hogue failed 
to inform not only the doctors at Columbia Medical of his heart murmur, but also 
Dr. Story before Hogue was in acute medical distress. Dr. Story shared his 
tentative diagnosis of pneumonia with Dr. Blomquist at Columbia Medical. Failure 
to respond fully and accurately to a doctor’s questions could hamper a doctor’s 
diagnosis, could delay appropriate treatment, and in the proper case, might 
raise a fact issue concerning a patient’s possible contributory negligence. 
See Elbaor v. Smith, 845 S.W.2d 240, 245 (Tex. 1992) (recognizing 
a patient’s duty of cooperation); see also Jackson v. Axelrad, 221 S.W.3d 
650, 654 (Tex. 2007) (discussing the duty of a patient to cooperate in his 
health care). But here, we need not identify the parameters of such a duty 
between lay patients and treating physicians. Cf. Jackson, 221 S.W.3d at 
655-57 (observing that, for purposes of a contributory negligence inquiry in a 
medical malpractice case, a physician patient’s specialized knowledge may be 
relevant to the ordinary care standard).
            
Negligence arises when an actor breaches a legal duty in tort, and the breach 
proximately causes damages. IHS Cedars Treatment Ctr., Inc. v. Mason, 143 
S.W.3d 794, 798 (Tex. 2004); D. Houston, Inc. v. Love, 92 S.W.3d 450, 454 
(Tex. 2002). Assuming, without deciding, that Hogue owed and breached a duty to 
disclose his prior heart murmur diagnosis, Columbia Medical must present some 
evidence that Hogue’s nondisclosure proximately caused his injury. Proximate 
cause includes both cause in fact and foreseeability. Mason, 143 S.W.3d 
at 798-99; Love, 92 S.W.3d at 454. Proximate cause cannot be satisfied by 
mere conjecture, guess, or speculation. Mason, 143 S.W.3d at 799; Doe 
v. Boys Clubs of Greater Dallas, Inc., 907 S.W.2d 472, 477 (Tex. 1995). In 
particular, cause in fact requires that the allegedly negligent act or omission 
constitute “a substantial factor in bringing about the injuries, and without it, 
the harm would not have occurred.” Mason, 143 S.W.3d at 799. Columbia 
Medical’s proof of causation to support its contributory negligence submission 
must rise above mere conjecture or possibility. See Mason, 143 S.W.3d at 
798-99; Duff v. Yelin, 751 S.W.2d 175, 176 (Tex. 1988). Columbia Medical 
claims that Hogue negligently failed to disclose his heart murmur and that 
Hogue’s omission delayed proper treatment by the physicians.
            
There is no evidence that the diagnosing doctors at Columbia Medical would have 
acted differently if Hogue had disclosed his heart murmur diagnosis. Dr. 
Blomquist, the ER doctor, testified that, if Hogue had disclosed his heart 
murmur diagnosis, it “would have perhaps moved a cardiac source higher” 
on his differential diagnosis and he “would have searched perhaps more 
diligently for a cardiac source” of the illness. (Emphasis added). Dr. 
Blomquist’s testimony further suggests that even if a cardiac source had been 
higher on his differential diagnosis, he would not necessarily have behaved 
differently:
 
class=Section4> 
Q: And if 
you would have considered [a] cardiac cause higher on [your differential 
diagnosis], would that have meant you would have considered obtaining a 
consultation of a cardiologist?
 
A: 
Possibly.
 
Q: Would 
that have meant that you would have considered requesting an echocardiogram?
 
A: 
Possibly. (Emphasis added).
 
 
class=Section5> 
“Perhaps” and 
“possibly” indicate conjecture, speculation or mere possibility rather than 
qualified opinions based on reasonable medical probability. See Merrell Dow 
Pharm., Inc. v. Havner, 953 S.W.2d 706, 729-30 (Tex. 1997) (stating that 
“can” and “could” do not indicate reasonable medical probability); see also 
Gen. Motors Corp. v. Sanchez, 997 S.W.2d 584, 591 (Tex. 1999). While the 
specific words “reasonable medical probability” need not be used, the testimony 
must demonstrate conduct that to a reasonable degree of medical certainty would 
have occurred. See Otis Elevator Co. v. Wood, 436 S.W.2d 324, 331-32 
(Tex. 1968). The testimony on causation proffered by Columbia Medical is 
insufficient to raise a question of fact on proximate cause. 
            
In addition, the testimony of Hogue’s second treating physician also fails to 
raise a question on whether Hogue’s nondisclosure of a heart murmur diagnosis 
caused his injury. When asked if he would have wanted or needed information 
about a prior heart murmur, Dr. Schroeder responded that he did not ask for that 
information and that he would not have found that information useful in an 
initial history.
 
class=Section6> 
 
Q: Would 
[the information that Hogue had previously been advised that he had a heart 
murmur] been the kind of information doctor, that you would have wanted to have 
included in or known about in Mr. Hogue’s history?
 
A: It’s 
not something that I routinely ask about.
 
Q: Okay. 
Would . . . history of heart murmur . . . be the kind of symptom that you as a 
critical care specialist would want to know about of a patient?
 
A: . . . I 
don’t usually ask about heart murmurs, and that’s not a bit of information that 
I would find useful in an initial history.
 
 
class=Section7> 
 
 
class=Section8> 
Because the 
physicians testified that knowing of Hogue’s heart murmur would not have been 
useful or changed their course of treatment, there is no evidence that Hogue’s 
nondisclosure of the condition caused his injury. 
            
While the Hogues are correct that the physicians’ opinions constitute no 
evidence of causation, they incorrectly imply that those statements are 
attributable to Columbia Medical. “A hospital is ordinarily not liable for the 
negligence of a physician who is an independent contractor.” Baptist Mem’l 
Hosp. Sys. v. Sampson, 969 S.W.2d 945, 948 (Tex. 1998). However, because 
Columbia offers no evidence of causation (other than to erroneously rely on the 
physicians’ statements), Columbia Medical failed to support its position that 
nondisclosure of the heart murmur diagnosis in reasonable medical probability 
contributed to Hogue’s injury. Thus, it was not error for the trial court to 
refuse to submit the contributory negligence question in the first phase of the 
trial. Although we do not approve of submitting contributory negligence to the 
jury in the third phase of trial, we need not reach the issue of whether this 
unusual approach in submitting the charge would constitute reversible error in a 
case warranting a contributory negligence submission.
B. Gross Negligence
            
On appeal, Columbia Medical next challenges the legal sufficiency of the 
evidence supporting gross negligence. Columbia Medical does not, however, 
challenge the quantum of exemplary damages. See Tex. R. App. P. 53.2(f) (“The petition 
must state concisely all issues or points presented for review.”). The Hogues 
argued to the jury that Columbia Medical was grossly negligent in a number of 
ways, including Columbia Medical’s failure to provide stat echo availability.[2] 
            
Two elements comprise gross negligence. First, viewed objectively from the 
actor’s standpoint, the act or omission complained of must depart from the 
ordinary standard of care to such an extent that it creates an extreme degree of 
risk of harming others. Lee Lewis Const., Inc. v. Harrison, 70 S.W.3d 
778, 784-86 (Tex. 2001); Universal Servs. Co. v. Ung, 904 S.W.2d 638, 641 
(Tex. 1995); Transp. Ins. Co. v. Moriel, 879 S.W.2d 10, 21-22 (Tex. 
1994); see also Wal-Mart Stores, Inc. v. Alexander, 868 S.W.2d 322, 326 
(Tex. 1993) (holding that gross negligence must involve an “objectively higher 
risk than ordinary negligence”). “Extreme risk” is not “a remote possibility of 
injury or even a high probability of minor harm, but rather the likelihood of 
serious injury to the plaintiff.” Moriel, 879 S.W.2d at 22 (quoting 
Alexander, 868 S.W.2d at 327); see also Harrison, 70 S.W.3d 
at 785. And the risk must be examined prospectively from the perspective of the 
actor, not in hindsight. Moriel, 879 S.W.2d at 23. Second, the actor must 
have actual, subjective awareness of the risk involved and choose to proceed in 
conscious indifference to the rights, safety, or welfare of others. 
Harrison, 70 S.W.3d at 785; Ung, 904 S.W.2d at 641; Moriel, 
879 S.W.2d at 23. 
            
Gross negligence must be proven by clear and convincing evidence. Tex. Civ. Prac. & Rem. Code § 
41.003(a)(3); see Sw. Bell Tel. Co. v. Garza, 164 S.W.3d 607, 627 
(Tex. 2004) (noting that “whenever the standard of proof at trial is elevated, 
the standard of appellate review must likewise be elevated”). Because of this 
heightened burden of proof, we apply a heightened standard of review: 
 
            
In a legal sufficiency review, a court should look at all the evidence in the 
light most favorable to the finding to determine whether a reasonable trier of 
fact could have formed a firm belief or conviction that its finding was true. To 
give appropriate deference to the factfinder’s conclusions and the role of a 
court conducting a legal sufficiency review, looking at the evidence in the 
light most favorable to the judgment means that a reviewing court must assume 
that the factfinder resolved disputed facts in favor of its finding if a 
reasonable factfinder could do so. A corollary to this requirement is that a 
court should disregard all evidence that a reasonable factfinder could have 
disbelieved or found to have been incredible. This does not mean that a court 
must disregard all evidence that does not support the finding. Disregarding 
undisputed facts that do not support the finding could skew the analysis of 
whether there is clear and convincing evidence.
 
Diamond 
Shamrock Ref. Co., L.P. v. Hall, 168 S.W.3d 164, 170 (Tex. 2005) (quoting 
In re J.F.C., 96 S.W.3d 256, 266 (Tex. 2002)). We review all the evidence 
in this case to determine whether the jury could have formed a firm belief or 
conviction that Columbia Medical’s conduct deviated so far from the standard of 
care as to create an extreme risk and that Columbia Medical was subjectively 
aware of, but consciously indifferent to, this risk.
            
The Hogues argue Columbia Medical was grossly negligent in its decision not to 
provide echocardiogram services on a stat basis for its emergency medical 
services and in its failure to advise the physicians of the lack of stat echo 
capability. Columbia Medical asserts that there is insufficient evidence under 
the law that the failure to provide an echocardiogram on a stat basis created an 
extreme risk to others. We review all the evidence in the light most favorable 
to the jury’s findings to determine whether a reasonable trier of fact could 
have formed a firm belief or conviction that its finding was true.
            
Before its opening in 1997, Columbia Medical determined that it would require 
echocardiographic capability to support its emergency department. Because it 
believed it would need a low volume of these essential services, however, 
Columbia Medical decided to outsource the echo services rather than provide them 
in-house. Scott Montgomery, Columbia Medical’s Director of Clinical Outpatient 
Services, was responsible for negotiating a contract for these services. 
Montgomery testified that it was “obvious” and “elementary” that a hospital 
emergency department would need echocardiograms on a stat, or urgent, basis. 
However, it is undisputed that Columbia Medical did not obtain stat, or urgent, 
echo capability with its outside provider, nor did its contract guarantee a 
response time for echocardiographic studies. The contract with Cardiovascular 
On-Call Specialists for echo services included a “stat” fee of $85 for any 
procedure that was ordered after hours (defined in the contract as after 5:00 
p.m. and before 8:00 a.m., on weekends, or on holidays). In addition, the 
contract provided Columbia Medical with an option to guarantee a response time 
during certain time periods by paying an “on-call” fee of $3 per hour, in 
addition to the base fee for services. The contract did not guarantee a response 
time during business hours, and Columbia Medical did not exercise the option to 
guarantee a response time for echocardiographic studies. As a result, On-Call 
Specialists was under no obligation to provide echo services within a specified 
time period, and Columbia Medical elected not to ensure the provision of urgent 
echo services to its critical care patients, which stands in contrast to 
Columbia Medical’s decision to obtain guaranteed response times for vascular 
studies from On-Call Specialists. Morton Graham, proprietor of On-Call 
Specialists, called Montgomery on a couple of occasions to discuss the 
guaranteed response option for echo studies, but Montgomery appeared 
uninterested and never engaged those services until after Hogue’s death. In 
addition, Graham explained that Montgomery never inquired what response time 
could be expected under the contract, and Montgomery acknowledged that he never 
consulted any physician concerning what an appropriate response time would 
be.
            
Dr. Ira Korman, Columbia Medical’s expert and professional consultant on 
hospital administration, testified that there is no requirement that a hospital 
provide echocardiography services, nor a requirement that if a hospital does 
provide such services, that the hospital must provide the services within a 
certain period of time. He also opined that Columbia Medical acting as a 
reasonably prudent hospital would, in the same or similar circumstances, enter 
into the contract for the provision of echo services, even though it did not 
provide for services on an urgent basis. Dr. Korman’s testimony was contradicted 
by the hospital. Montgomery, director of those services for Columbia Medical, 
testified that stat echo services were necessary at Columbia Medical. Although 
Montgomery testified that the medical staff had reported that they were 
satisfied that patient care needs were being met under the contract, he admitted 
that he did not know if an echo had been needed on a stat basis from the August 
1997 opening of the medical center to the time of Hogue’s treatment in the 
emergency department at Columbia Medical.
            
Peter Bastone, the Hogues’ expert on the hospital’s standard of care and Chief 
Executive Officer of a hospital in California, testified that when a hospital 
contracts to outsource a patient service, “there should be specific guidelines 
in terms of how quickly that contracted service will come in and provide that 
service” and that “its staff need[s] to be aware of how to order this 
procedure.” Similarly, Montgomery and Pat Sullivan, a registered nurse who was 
Columbia’s Chief Operating Officer, testified that it was prudent and necessary 
for the hospital to have communicated to the physicians whether they would be 
able to get an echo on a stat basis. Furthermore, Montgomery testified that he 
did not inform Columbia Medical’s medical staff that an echocardiogram could not 
be provided on a stat basis and that he was not aware if anyone communicated 
this information to them. In fact, both Drs. Blomquist and Schroeder (director 
of the ICU), physicians who treated Hogue, testified that they did not know that 
the echo services were outsourced or that there was no effective procedure to 
ensure the availability of echo services on a stat basis to treat their 
patients, prior to March 9, 1998. This vital information was not even contained 
in Columbia Medical’s Health Care Plan, which Sullivan testified is the method 
by which the hospital communicates to the medical staff the capabilities the 
hospital has to support patient care.
            
There is some evidence that the nursing staff was informed before March 9, 1998 
that echo services were outsourced, and Dr. Schroeder discovered that fact for 
the first time when he ordered the stat echo for Hogue on March 9. There is 
clear and convincing evidence that Columbia Medical had actual knowledge of the 
necessity for emergency echo services in this case, declined to make such 
services available, and failed to communicate the limitation on its echo 
services to the physicians or nursing staff. This evidence shines a different 
light on Montgomery’s statement that the medical staff was satisfied that 
patient care needs were being met because the critical deficiency in the 
hospital’s provision of necessary emergency medical capabilities did not become 
apparent to the treating physicians until it tragically manifested in Hogue’s 
case.
            
When the evidence establishes the necessity for certain urgent services for 
critical care, the experts explained that the need may be met by timely 
transferring a patient to a nearby facility that provides the service. Bastone 
testified that “once the patient’s assessed and hopefully stabilized, and it’s 
knowledgeable that you don’t have the technology or the specialist available to 
do the kind of intervention that’s necessary, then transferring that patient as 
quickly as possible is key.” The Hogues’ causation expert, Dr. Sidney Levitsky, 
a cardiothoracic surgeon, Harvard Medical School professor, and senior vice 
chairman of the department of surgery at Beth Israel Deaconess Medical Center in 
Boston, also testified that, ideally, a patient should be transferred “as 
quickly as possible to the best facility able to take care of their illness, 
particularly, if the local facility doesn’t have the wherewithal to do it.” In 
fact, Dr. Blomquist, one of Hogue’s treating physicians, testified that he had 
an “obligation” to transfer a patient if he had determined that the hospital 
could not care for that patient. And Montgomery admitted that if a patient 
needed a stat echo, the patient should be transferred to another facility with 
stat echo capabilities. However, in this case, because the hospital did not 
communicate the hospital’s inability to ensure the availability of emergent echo 
services, the physicians had no opportunity to adequately assess the risks and 
benefits of transferring Hogue to another hospital in lieu of waiting to obtain 
echo services. 
            
The dissenting Justices suggest that the doctor who ordered Hogue’s echo, Dr. 
Schroeder, was informed about the length of time it would take to get an echo 
and chose to wait rather than transfer Hogue or attempt to obtain diagnostic 
services elsewhere:
 
Despite 
the echo technician having told Hogue’s nurse that it would probably take up to 
two hours for him to get to the hospital, Dr. Schroeder’s echo order remained in 
place, and Hogue’s treating physicians chose to wait rather than immediately 
transfer Hogue to another hospital, which could have been done under the 
hospital’s policies.
 
 
___ S.W.3d at 
___ (Green, J., concurring and dissenting). The quoted passage implies that Dr. 
Schroeder was informed about the extent of the delay and exercised medical 
judgment in deciding to wait nearly three hours for the study, but that is 
contrary to the evidence at trial. The record shows that Dr. Schroeder 
appreciated both the gravity of the situation and that time was of the essence. 
When Dr. Schroeder phoned the radiology department to order the echo, he learned 
for the first time that echo services were outsourced and that a technician 
would have to be called in from another location. Given this information, Dr. 
Schroeder testified that he informed the radiology department that he wanted the 
echo “now.” He testified unequivocally that he was never told when the echo 
could be expected. The evidence does not suggest that Dr. Schroeder was aware 
that it would take one hour for the hospital to communicate with the echo 
technician and another two hours to get the echo study. In fact, Dr. Schroeder 
testified that he expected to get an echo “within 30 to 60 minutes.”
            
There is considerable other evidence in this case that such a significant delay 
was not expected. Indeed, all the evidence offered regarding the appropriate 
stat echo response time in this case establishes that Columbia Medical clearly 
breached the standard of care. Dr. John Lawson, the cardiologist who recommended 
the stat echo for Hogue, testified that, in his opinion, “stat” meant “within an 
hour or two.” In addition, Montgomery testified that, as applied to an order for 
an echocardiogram, “stat” means that the “procedure needs to be prioritized 
higher than . . . routine orders and it needs to be done as soon as possible,” 
but that it would not necessarily be possible to perform an echo immediately. 
However, Montgomery acknowledged that Columbia Medical’s internal list of 
abbreviated terms defines “stat” as “immediately.” Bastone, the Hogues’ expert 
on hospital administration, testified that the standard of care for stat echo 
response time is a thirty minute response. He opined that Columbia Medical’s 
response time in this case fell below that standard. Dr. Levitsky, the Hogues’ 
causation expert, testified that the emergency rooms and intensive care units he 
had been affiliated with had echo response times that ranged from fifteen to 
thirty minutes. He testified that the three hours it took to obtain an echo 
study for Hogue was too long. 
            
In terms of the degree of risk, experts testified that echocardiograms are 
ordered on a stat basis only when necessary, which is uncommon. However, Dr. 
Levitsky testified that it is still important to be able to perform an 
echocardiogram on a stat basis because “many times a patient’s life is in 
immediate danger, or shortly will begin to decompensate if one misses the 
diagnosis.” He testified that, in this case, Hogue would have had a 
ninety-percent chance of survival if he had been diagnosed and transferred to 
Baylor Irving earlier. 
            
Experts for both the plaintiffs and the defendant testified that a health care 
facility that provides emergency cardiogenic services must have stat echo 
capability, whether provided by staff or on a contract basis. As previously 
detailed, several medical experts testified that the response time for a stat 
echo was fifteen to sixty minutes. Dr. Schroeder, the physician who primarily 
treated Hogue at Columbia Medical that day, testified that an echo on a stat 
basis should be obtained in under an hour. Columbia Medical’s Director of 
Clinical Outpatient Services confirmed that stat echo ability was necessary for 
Columbia Medical’s emergency department, and it was Columbia Medical’s policy 
that a “stat” echo should be provided “immediately” or as soon as possible. 
Notwithstanding this knowledge, Columbia Medical elected not to secure echo 
capability on a stat basis, even after Morton Graham advised the hospital to do 
so on more than one occasion. Importantly, Columbia Medical failed to advise the 
physicians on staff that it did not provide echo services on an emergency basis. 
Because the hospital had not informed its emergency medical staff of the lack of 
stat echo capability, Hogue was without a timely, emergency echocardiogram at 
Columbia Medical and was not transferred to obtain one. 
            
Furthermore, although the stat echo was ordered at 3:35 p.m., Columbia Medical’s 
nurses did not call the echo technician service until 4:10 p.m. Morton Graham 
returned the call at 4:30 p.m., but advised the ICU nurse that he would not be 
able to arrive until approximately two hours later. After arriving at Columbia 
Medical shortly after 6:00 p.m., Graham explained, he had to spend time setting 
up the room to perform the echo. The stat echo study was not completed until 
6:30 p.m., three hours after the emergency echo was ordered. 
            
Columbia Medical argues that the inability of the on-call service to respond 
sooner than the two-hour guaranteed response time option provided in the 
contract negates proximate causation. We disagree. Graham affirmed that if 
Columbia Medical had wanted stat echo capabilities, he would have been willing 
to negotiate terms for an urgent response time, but Columbia Medical was not 
interested in guaranteeing a response time.[3] Although Graham provided a two-hour 
response option, Columbia Medical did not exercise that option. Nevertheless, 
Graham testified that (1) he actually got to the hospital within two hours of 
being paged in Hogue’s case, which is all he would have been able to guarantee 
under the terms of the contract, and (2) he could not have gotten there any 
sooner on that day. Graham made it clear, however, that the terms of the 
contract with Columbia Medical did not obligate him to obtain the resources to 
be able to respond in less than two hours. Graham testified that he would always 
come as quickly as he possibly could, but he was not obligated to do so and, 
therefore, could not guarantee that he would be able to do so at any given time. 
Tragically for Hogue, Graham was unable to get there any earlier than he did, 
but that does not negate proximate cause. To the contrary, it is the lack of an 
effective procedure for getting these critical services on a stat basis—in two 
hours or less, as all the experts testified was required—that supports the 
jury’s gross negligence finding. As Dr. Schroeder stated, if he and Dr. Hecht 
had obtained the echo within 30 or 60 minutes, he “would have started the 
process to transfer” at that point, increasing the opportunity to save Hogue’s 
life.
            
In sum, there is sufficient evidence to support the jury’s conclusion that 
Columbia Medical acted with conscious indifference to an extreme risk of serious 
injury when it (1) elected to outsource echo services without a guaranteed 
response time while providing emergency services, (2) failed to communicate this 
limitation to its medical staff so they could consider other options to treat 
critical care patients, and (3) delayed obtaining the echo in spite of the 
serious risk to Hogue’s health. Although the jury was presented with some 
conflicting evidence, we conclude that the jury could have resolved disputed 
facts in favor of the Hogues to form a firm belief or conviction that Columbia 
Medical breached the standard of care, that such a departure created an extreme 
degree of risk of serious injury, and that Columbia Medical had actual, 
subjective awareness but acted in a manner that exhibited conscious indifference 
to this risk. Garza, 164 S.W.3d at 621, 627 (holding that an elevated 
burden of proof at trial requires a correspondingly elevated standard of 
review); In re J.F.C., 96 S.W.3d at 266. Because we conclude that the 
Hogues presented legally sufficient evidence of gross negligence based on the 
hospital’s failure to provide stat echo capability without communicating the 
lack of such services to the physicians and nurses, we need not reach the other 
bases of gross negligence the Hogues raised. We therefore affirm the court of 
appeals’ judgment affirming the award of exemplary damages capped by the 
MLIIA.
            
We do not hold that Texas law requires all hospitals to provide all services to 
all patients. Different hospitals may provide some services but not others 
without necessarily breaching the standard of care, depending, of course, on the 
circumstances. The standards are established under the common law by qualified 
experts. In this case, the hospital knew of the “obvious” necessity for 
potentially life-saving stat echo capabilities in connection with the emergency 
medical services it decided to provide. Notwithstanding that knowledge, the 
hospital failed to obtain an appropriate response time for critical support 
services, failed to advise the medical staff of that limitation so they could 
properly and timely treat patients in acute distress or transfer them to another 
facility, and failed to provide an effective procedure to respond appropriately 
to Hogue’s life-threatening situation. Under those circumstances, a jury could 
properly conclude the hospital acted with conscious indifference.
C. Loss of Inheritance Damages
            
Columbia Medical next argues that the Hogues presented insufficient evidence to 
support the jury’s loss of inheritance damages award. The jury was asked to 
award loss of inheritance damages, if any, defined as “the loss of the present 
value of the assets that the deceased, in reasonable probability, would have 
added to the estate and left at natural death to the [Hogues].” The legal 
sufficiency standard for loss of inheritance damages is whether there is more 
than a scintilla of evidence to enable a reasonable person to reach a 
conclusion. See St. Joseph Hosp. v. Wolff, 94 S.W.3d 513, 519-20 
(Tex. 2002). We resolve all disputed evidence in favor of the jury’s finding, 
but may not disregard undisputed evidence if a reasonable jury could not. 
Id. at 519-20. Columbia Medical does not argue that inheritance damages 
are unrecoverable or cannot be submitted as a separate item of damages. 
Therefore, we review for legal sufficiency only under the charge as submitted to 
the jury. See Osterberg v. Peca, 12 S.W.3d 31, 55 (Tex. 2000). 

            
We previously held in Yowell v. Piper Aircraft Corp., 703 S.W.2d 630, 633 
(Tex. 1986), and again in C&H Nationwide, Inc. v. Thompson, 903 
S.W.2d 315, 322-24 (Tex. 1994) (superseded by statute and abrogated on other 
grounds by Battaglia v. Alexander, 177 S.W.3d 893, 909 (Tex. 2005)), that 
loss of inheritance damages may be recovered in appropriate circumstances. When 
loss of inheritance damages are recoverable, a plaintiff must prove that the 
decedent’s earnings less his expenditures would have left an estate for his 
beneficiaries to inherit and that the beneficiaries would have outlived the 
decedent. C&H, 903 S.W.2d at 323-24; Yowell, 703 S.W.2d at 
633. In Yowell, we held that there was sufficient evidence of loss of 
inheritance damages when the plaintiff beneficiaries valued the estate by 
introducing evidence as to “the decedents’ salaries, expected raises, expected 
promotions and salary increases, earning capacities, enforced savings through 
pension plans, spending habits, age, health, and relationship with the wrongful 
death beneficiaries.” 703 S.W.2d at 634. In C&H, we clarified that 
although loss of inheritance damages are allowed and are to an extent 
indeterminate, “the willingness of the law to accommodate some indeterminacy in 
assessing damages does not mean there are no limits.” 903 S.W.2d at 323. If a 
plaintiff proves loss of inheritance damages, the beneficiary is entitled to the 
present value of the beneficiary’s share of what the decedent’s estate would 
have been if the decedent had died a natural death. Yowell, 703 S.W.2d at 
633.
            
Columbia Medical challenges the loss of inheritance damages on three grounds. 
First, Columbia Medical argues that the evidence did not establish that Hogue’s 
wife would have outlived him. Next, Columbia Medical argues that the evidence 
did not establish that Hogue’s future earnings would have exceeded his 
expenditures. Finally, Columbia Medical challenges the competency of the Hogues’ 
financial expert, Dr. Allen Self.
            
The Hogues did not present legally sufficient evidence to support either that 
Hogue’s wife would have outlived her husband, if he had died a natural death, or 
that he would have had an estate left after his passing to bequeath to his 
beneficiaries. To prove that Hogue’s wife would have outlived Hogue, the Hogues 
presented evidence that she was three years younger than him, that life 
expectancy tables showed her outliving her husband by nearly seven years, and 
that the jury observed her appearance and demeanor in court. There was also 
testimony regarding her employment. Columbia Medical opines that this evidence 
is insufficient and that expert testimony was required to prove her medical 
condition. We will not, as Columbia Medical prompts, require proof that Hogue’s 
wife would have no health problems in the future, but we do require at least 
some evidence of the beneficiary’s health. See Yowell, 703 S.W.2d at 634 
(“The plaintiffs also produced evidence of the age and health of the wrongful 
death beneficiaries.”). Asking a jury to ascertain Hogue’s wife’s health based 
on her age or from simply observing her in court is not sufficient.
            
There was also insufficient evidence to prove the present value of what Hogue’s 
estate would have been at his natural death. The jury awarded Hogue’s wife 
$306,393 in loss of inheritance damages, the figure advanced by the Hogues’ 
expert, Dr. Self. Dr. Self testified that in arriving at the lost inheritance 
damages, he considered, inter alia, Hogue’s savings accounts, stock 
portfolio, equity in the marital home, and estimated future earnings based on 
past earnings and work expectancy tables. While this evidence goes a long way 
toward proving loss of inheritance damages, to the extent they are recoverable, 
it does not cross the finish line under Yowell and C&H. 
            
Yowell and C&H emphasize that in arriving at the present value 
of the decedent’s estate, the figures used in the analysis must be specific to 
the decedent. See C&H, 903 S.W.2d at 323; Yowell, 703 S.W.2d 
at 634. Some of the data Dr. Self utilized in his economic calculation came from 
Hogue’s past work history, earnings, and savings. However, Dr. Self’s work 
expectancy age of seventy years old, from which he calculated Hogue’s remaining 
years in the workforce, did not account for the additional factors of Hogue’s 
health after his operative procedure (had it been successful), post-operative 
recuperation time, or likely future medical expenses. Instead, Dr. Self based 
his calculations on an “average person,” and he extracted a working expectancy 
of seventy years old from the work expectancy table. Thus, Dr. Self’s 
calculations improperly failed to account for the health of the decedent. See 
Yowell, 703 S.W.2d at 634. 
            
Moreover, figures used in determining how much of Hogue’s earnings would go 
towards family expenses were based on assumptions contrary to undisputed facts. 
The value of the remaining estate was based on the assumption that the Hogues’ 
home mortgage would have been paid off before Hogue’s death, leaving no mortgage 
payment and therefore greater discretionary income. However, Dr. Self admitted 
that he did not know that Hogue’s wife was still making monthly mortgage 
payments on the home or that at Hogue’s passing, the Hogues were building a new 
home. Importantly, Dr. Self’s analysis did not consider the impact of a new home 
on the family’s finances in terms of equity or cost. For the reasons stated 
above, we hold that there was insufficient evidence to support the jury’s award 
of loss of inheritance damages. 
D. Pre- and Postjudgment Interest
            
The final issue on appeal is the rate of pre- and postjudgment interest 
applicable to the judgment. Pursuant to Texas Finance Code section 304.103, 
prejudgment interest is awarded at the same rate as postjudgment interest. For 
that reason, we will refer to the pre- and postjudgment interest rates 
collectively as “interest rate.” 
            
House Bills 2415 and 4 lowered the floor interest rate to five percent from ten 
percent, and the ceiling interest rate to fifteen percent from twenty percent in 
subsections (c)(2) and (c)(3), respectively, of Texas Finance Code § 304.003, 
effective September 1, 2003. Act of June 2, 2003, 78th Leg., R.S., ch. 676, 
§ 2(a), 2003 Tex. Gen. Laws 2097; Act of June 2, 2003, 78th Leg., R.S., ch. 
204, § 6.04, 2003 Tex. Gen. Laws 862, 899. See also BIC Pen Corp. v. 
Carter, 251 S.W.3d 500, 510 (Tex. 2008). The amendments applied to final 
judgments that are “signed or subject to appeal on or after the effective date 
of this Act.” § 2(a), 2003 Tex. Gen. Laws 2097; § 6.04, 2003 Tex. Gen. 
Laws 862. The trial court signed the amended final judgment in this case on 
December 3, 2002, before the effective date. However, Columbia Medical argues 
that the amendments apply because the case was “subject to appeal” on or after 
the amendments’ effective date.
            
In interpreting section 304.003 of the Texas Finance Code, we “‘determine and 
give effect to the Legislature’s intent’” from the plain and common meaning of 
the statute. McIntyre v. Ramirez, 109 S.W.3d 741, 745 (Tex. 2003) 
(quoting Tex. Dep’t of Transp. v. Needham, 82 S.W.3d 314, 318 (Tex. 
2002)). The Court must not interpret the statute in a manner that renders any 
part of the statute meaningless or superfluous. City of Marshall v. City of 
Uncertain, 206 S.W.3d 97, 105 (Tex. 2006) (citing City of San Antonio v. 
City of Boerne, 111 S.W.3d 22, 29 (Tex. 2003)).
            
Columbia Medical’s plain language argument rests on its assertion that if the 
Legislature had wanted to limit applicability of the amendments to judgments 
“capable of being appealed,” the Legislature would have used those words. Under 
Columbia Medical’s logic, therefore, courts must apply the amended section 
304.003 to every case in the trial court or the appellate process as of the 
amendments’ effective dates. This interpretation is too broad. 
            
Columbia Medical argues that the phrase “subject to appeal” essentially means 
“pending on appeal,” thereby reducing the interest award. Under this position, 
the amendments would apply to all cases pending in the trial court and lower 
courts of appeals on the amendments’ effective date. The Hogues counter that the 
amendments only apply to judgments that became appealable after the effective 
date of the amendments. 
            
The plain and ordinary meaning of “subject to appeal,” when modifying a 
judgment, is “capable of being appealed,” whether that is a final judgment 
disposing of all parties and issues or an interlocutory appeal. Hosts of other 
statutes also indicate that the plain and common meaning of “subject to appeal” 
is capable of being appealed. See, e.g., Tex. Bus. & Com. Code § 15.10(j) 
(“Any final order is subject to appeal.”); Tex. Civ. Prac. & Rem. Code § 
36.002(a) (applying section 36 to a foreign country judgment that is final where 
rendered “even though an appeal is pending or the judgment is subject to 
appeal”); Tex. Educ. Code § 
28.0214(b) (declaring a school district board of trustees’ determination as to 
grades not “subject to appeal”); Tex. 
Fam. Code § 52.015(c) (making a directive to apprehend a child not 
“subject to appeal”); Tex. Human Res. 
Code § 36.101(m) (“[A] final order issued by a district court under [the 
section dealing with attorney general action investigation of Medicaid fraud] is 
subject to appeal to the supreme court.”). Interpreting the plain and common 
meaning of “subject to appeal” to mean “on appeal” instead of “capable of being 
appealed” renders the above examples absurd. See Tex. Dep’t of Protective 
& Regulatory Servs. v. Mega Child Care, Inc., 145 S.W.3d 170, 177-79 
(Tex. 2004).
            
Therefore, contrary to Columbia Medical’s urging, we interpret the plain 
language of House Bills 2415 and 4 to apply section 304.003 to judgments that 
became final after their effective dates. In doing so, we apply the plain and 
common meaning of the words “subject to appeal.” Because the appeal of the 
judgment in this case could not have been initiated after the effective dates of 
the amendments, House Bills 2415 and 4 do not apply. We affirm the court of 
appeals on this point. 
III. Conclusion
            
Although we have serious reservations about the trial court’s decision to 
trifurcate the trial, we affirm the court of appeals’ holding on the 
contributory negligence issue because Columbia Medical did not raise a fact 
question on causation necessary to support the submission of the question to the 
jury. We affirm the award of actual damages and gross negligence damages awarded 
to the Hogues because the proffered evidence satisfies the standard for 
recovery. We reverse the portion of the judgment awarding loss of inheritance 
damages. Finally, we affirm the court of appeals’ holding that the 2003 
amendments to Texas Finance Code section 304.003 do not apply to cases that were 
either actually appealed or capable of being appealed before the amendments’ 
effective dates. 
 
______________________________
J. Dale 
Wainwright 
                                                                                                
Justice 
 
OPINION 
DELIVERED: August 29, 2008










[1] 
The lawsuit originally named several doctors and professional associations, but 
these defendants, by way of settlement, nonsuit, or summary judgment, are no 
longer parties to the suit.

[2] 
The Hogues also argue that Columbia Medical was grossly negligent due to its 
failure to have an on-call list by specialty and for misleading advertising. For 
the reasons that follow, we need not reach these additional bases.

[3] 
Graham testified that, if Columbia Medical had wanted to secure expedited echo 
services, even “30 minutes to 45 minutes,” he would have done “everything” to 
secure the resources required to service the hospital’s needs. But because 
Columbia Medical declined to consider expedited echo services, he lacked the 
resources to guarantee expedited response times.